BIRMINGHAM SCHOOL DISTRICT v BUCK

Docket No. 140397. Submitted November 2, 1993, at Detroit. Decided March 21, 1994, at 10:10 A.M. Leave to appeal sought.

Robert Buck, a tenured teacher, was discharged by the Birmingham School District because of sexual harassment of another teacher. The charge of sexual harassment arose as a result of Buck having placed in the school mailbox of the victim over a period of several months more than sixty letters, most of which were sexually explicit and of a highly personal nature. Buck claimed that the victim had never discouraged his advances and, indeed, had encouraged him. The testimony of the victim refuted Buck's contention, and her co-workers gave testimony tending to support her testimony. The State Tenure Commission concluded that the testimony of the victim was not credible because she had not kept copies of letters she allegedly sent to Buck to discourage him, she had waited more than three months to notify school administrators of the situation, and she had told other teachers about the letters despite her claim that she had not come forward earlier because she wished to protect Buck. The commission found that Buck had not engaged in sexual harassment or unprofessional conduct by placing private letters in the victim's mailbox, because it had not been made clear to Buck that his attentions were unwelcome and, accordingly, ordered Buck's reinstatement. The Oakland Circuit Court, Robert L. Templin, J., denied the school district's petition for review, finding that there was competent, material, and substantial evidence supporting the commission's findings. The school district appealed.

The Court of Appeals *held:*

1. The appeal of a local school district's decision to discharge a tenured teacher is reviewed de novo by the State Tenure Commission, which has the authority to take additional testimony and determine anew all questions of law and fact.

2. Review by the Court of Appeals of the State Tenure Commission's findings is limited to determining whether those findings are supported by competent, material, and substantial evidence on the whole record.

3. The reasons given by the commission for rejecting the victim's testimony were supported by neither the evidence on

the record nor logic. None of the reasons forwarded by the commission compels the conclusion that the victim's testimony was not worthy of belief, and the commission's conclusion that there was no harassment ignores both Buck's admission of his attempt to suborn perjury in support of his position and the testimony of the co-workers that uniformly supported the victim's version of the events and contradicted Buck's assertion. Under the circumstances presented by this record, the commission's determination was not supported by competent, material, and substantial evidence on the whole record.

Order of the State Tenure Commission reversed and order of the Birmingham School District reinstated.

*Hardy, Lewis, Pollard & Page, P.C.* (by *William G. Albertson*), for the petitioner.

*Jan C. Leventer,* for the respondent.

Before: CAVANAGH, P.J., and MARILYN KELLY and M. D. SCHWARTZ,* JJ.

MARILYN KELLY, J. The Birmingham School District appeals as of right from an order of the Oakland County Circuit Court affirming a decision of the State Tenure Commission. The Commission reinstated Robert Buck, a tenured teacher at Groves High School whose employment the Birmingham School Board had terminated because of his sexual harassment of another teacher. We reverse and reinstate the decision of the Board.

### FACTUAL BACKGROUND

The events which prompted Buck's dismissal are as follows:

In 1987, after the school year began, Leslie Thirjung, a teacher at Groves, began to find letters and gifts from Robert Buck in her school mailbox. Initially, she threw them away. Later, acting on

---

* Circuit judge, sitting on the Court of Appeals by assignment.

the advice of coworkers, she saved them and over the next several months accumulated approximately sixty letters. Most were sexually explicit and of a highly personal nature. Buck continuously invited Thirjung to travel to New York City with him and to have an extramarital affair.

While Thirjung told her husband about the letters in late January, she did not promptly inform school administrators about them. She claimed to have been concerned about Buck's mental health, feeling she could handle the situation without help. Since she and Buck worked in the same building, she sought to maintain a cordial professional relationship. During the same period, Buck told people he was despondent and suicidal, made at least one suicide gesture and was under professional care for depression.

Between November, 1987 and May, 1988, while Buck waged his letter writing campaign, he and Thirjung also had a limited number of social contacts. They present wildly different versions of the contacts.

During a School Board hearing, Buck claimed that Thirjung kissed him in November at a faculty gathering. Thirjung denied it. Witnesses testified that Buck never approached or spoke to Thirjung at the gathering.

In January, 1988, at a social gathering, a group of teachers including Buck and Thirjung discussed traveling to New York together. Later, Buck claimed that at this event he and Thirjung discussed traveling together privately, prompting his letter inviting her to New York. Thirjung responded that they never had such a discussion. Witnesses testified that Buck and Thirjung never had a private conversation at the gathering.

Buck claimed they went out together on Febru-

ary 5, 1988. However, Thirjung testified that she met a woman friend for dinner that night. Her calendar contained a note of the meeting and her friend confirmed it.

On February 19, 1988, after finding a card in her mailbox, Thirjung interrupted Buck's class and asked him to her office. He claimed that she hugged him, thanked him for the gifts and they talked. According to Thirjung, she urged him to stop writing and giving her gifts.

Buck claimed that Thirjung invited him to meet after a school district-wide event. He claimed that they met and had a long personal conversation. According to Thirjung, while all school district faculty were invited to a restaurant following the event, only she and Buck attended from her school. She had a drink with him, discouraged his romantic overtures and listened to him talk about his marriage, his broken love affair and his depression. When they left, she gave him a friendly hug and told him she wanted a professional relationship.

Buck claimed that Thirjung invited him to have a drink after a staff meeting in March but then refused because of the lateness of the hour. According to Thirjung, Buck came to the restaurant uninvited and sat at the bar staring at her. Another faculty member, aware of the situation, walked Thirjung to her car to help her discourage additional overtures from Buck.

According to Thirjung, Buck's letters became more friendly and less romantic in March. Thirjung claimed that, to encourage this trend, she wrote a note of appreciation to him. In response, Buck's letters again became invitational and sexual. At about this time, Thirjung sought the advice of the athletic director on how to handle the situation, and claims to have attempted to follow

his advice. The letters stopped fairly abruptly in April, 1988.

In May, 1988, another teacher told Thirjung that Buck was telling colleagues that Thirjung was pursuing him, forcing him continually to rebuff her. After learning of this, Thirjung finally reported Buck's conduct to the principal of Groves.

In June, 1988, Thirjung filed charges against Buck, alleging that he had sexually harassed her. Pursuant to the Teachers' Tenure Act, the School Board held a hearing regarding the charges and terminated Buck's employment. MCL 38.101 *et seq.*; MSA 15.2001 *et seq.*

At the School Board hearings, Thirjung claimed that she repeatedly and clearly discouraged Buck's attentions. She acknowledged that she wrote approximately five letters to him encouraging a friendly professional relationship. She did not keep copies of the letters. Buck retained the note sent in March, in which Thirjung stated that she was too busy to meet with him, but signed it "Love, Les."

Buck claimed that Thirjung never discouraged his advances. He claimed that she wrote at least fourteen or fifteen romantic notes to him, but that he threw all but the one away. Buck also admitted that he asked another teacher to falsely testify that he had read a romantic letter written by Thirjung. Buck abandoned the idea because the friend refused. Buck also admitted that, when he told another teacher Thirjung was pursuing him, he lied.

### PROCEDURAL HISTORY

Based on the evidence, the Board discharged Buck, finding he had sexually harassed Thirjung by sending her over sixty letters seeking a sexual

relationship, which she neither welcomed nor encouraged.

Buck appealed to the Tenure Commission. After a hearing, the Commission concluded that Buck was unaware that Thirjung did not want the attention and was not interested in pursuing an extramarital affair. The Commission wrote:

> It is impossible to determine with certainty whether appellant's beliefs were based on Mrs. Thirjung's active encouragement or due to conflicting signals given by Mrs. Thirjung. This determination is not necessary to our findings, however, because we believe, under either circumstance, Mr. Buck's actions were not discouraged and his belief that they were welcome was reasonable under the circumstances.
>
> We conclude that appellant's letter writing was not discouraged and his belief that it was encouraged was reasonable under the circumstances. Based on these findings, we cannot conclude that appellant's attention to Mrs. Thirjung was unwelcome.

The Commission concluded that the letters written by Buck substantiated his version of the events. It correlated the letters with actual incidents and concluded that they were the best indicator of what occurred. The Commission determined that Buck would not have pursued Thirjung if she had clearly rejected his solicitations. It found that Thirjung had entrusted Buck with confidences and that he had done the same, reasoning that he would not have done so if he were continually rejected by Thirjung.

Finally, the Commission concluded that Thirjung was not credible because 1) she claimed to have written three to five letters to respondent, yet did not save copies of the correspondence; 2)

she waited three and a half months before going to the school administration; 3) although she maintained she wanted to protect Buck, she told other teachers and the head of the athletic department about the letters; and 4) the personal letters stopped around the time of the lost letter incident in April. Buck claimed that he received his first indication that Thirjung no longer wanted to receive his letters at that time.

The Commission found that Buck did not sexually harass Leslie Thirjung; he did not engage in unprofessional conduct by placing private letters in her mailbox proposing a sexual relationship where the letters were not unwelcome. It reinstated Buck.

The School Board appealed from the decision to the circuit court. The court denied the appeal. It found that Thirjung's admission that she attempted to maintain a platonic relationship with Buck, combined with her note to him, constituted competent, material and substantial evidence supporting the findings.

### THE TENURE COMMISSION'S STANDARD OF REVIEW

On appeal to this Court, the School Board contests the standard of review used by the Tenure Commission. It asserts that the Legislature did not intend the Commission have de novo review of a local school board's decision to terminate a teacher under the Teachers' Tenure Act. MCL 38.71 *et seq.*; MSA 15.1971 *et seq.* We disagree.

MCL 38.139; MSA 15.2039 of the Teachers' Tenure Act provides that the Commission shall act as a board of review for all cases appealed from the decision of a controlling board. The Michigan Supreme Court and this Court have continuously held that appeal from a school board decision

subjects all questions of fact and law to Commission review and determination de novo. *Lakeshore Bd of Ed v Grindstaff (After Second Rem),* 436 Mich 339, 353-354; 461 NW2d 651 (1990); *Long v Royal Oak Twp and Royal Oak Bd of Ed, Dist No 1, Fractional,* 350 Mich 324, 326-327; 86 NW2d 275 (1957); *Rehberg v Melvindale Bd of Ed,* 345 Mich 731, 737-739; 77 NW2d 131 (1956); *Comstock Public Schools v Wildfong,* 92 Mich App 279; 284 NW2d 527 (1979). The Commission has the power and authority to take additional testimony and determine anew, as original questions, all issues of fact and law decided by a school board. *Comstock,* 283-284. Here, the Commission was entitled to engage in de novo review and make independent findings of fact.

### THE ADEQUACY OF THE EVIDENCE

The Board also argues that the Commission's decision overturning the Board's discharge of Buck was not supported by competent, material and substantial evidence on the record as a whole. We agree.

This Court's review of the State Tenure Commission's findings is limited. We determine from the record whether there was competent, material and substantial evidence received by the Board or the Commission, or both, to support the Commission's finding. Const 1963, art 6, § 28; MCL 24.306(1)(d); MSA 2.560(206)(1)(d); *Ann Arbor Public Schools Bd of Ed v Abrahams,* 202 Mich App 121, 128; 507 NW2d 802 (1993); *Tomczik v State Tenure Comm,* 175 Mich App 495, 499; 438 NW2d 642 (1989); *Barcheski v Grand Rapids Bd of Ed,* 162 Mich App 388, 395; 412 NW2d 296 (1987). Substantial evidence is evidence which a reasoning mind would accept as sufficient to support a conclusion. *Tomc-*

*zik,* 499. The Commission's findings of fact are conclusive, and an appellate court cannot decide questions of fact which were before the Commission. *Farrimond v East Jordan Public Schools Bd of Ed,* 138 Mich App 51, 56; 359 NW2d 245 (1984); *Frieberg v Big Bay De Noc School Dist Bd of Ed,* 61 Mich App 404, 416; 232 NW2d 718 (1975), after remand 91 Mich App 462; 283 NW2d 775 (1979).

A determination by this Court whether the Commission's decision was based on competent, material and substantial evidence on the record appears to involve a thorough review of the entire record. It requires an independent assessment of whether the Commission's determination of the credibility of the parties is supported by the evidence. *Abrahams,* 128-132.

In *Abrahams,* a panel of our Court scrupulously examined and set forth the evidence. It determined that the evidence supported the Commission's factual finding that each young woman who testified against Abrahams lacked credibility. Here, similarly, we must decide if the Commission's finding that Buck offered the more credible version of his relationship with Thirjung is supported by competent, material and substantial evidence. We conclude that it is not. Reasonable minds could not find the contents of Buck's letters sufficient to support the conclusion that Thirjung either did not discourage or encouraged Buck. *Abrahams,* 128.

First, Buck sent at least sixty sexually explicit communications to Thirjung soliciting an extramarital affair. The letters reveal a man obsessed with entering into a sexual relationship with a woman. They detail his fantasies and desires, but little more. When one considers that they were also the letters of a man whose mental health was

tenuous at best, they cannot be considered compe-. tent evidence of the events which transpired.

That the contents of Buck's letters were tied to specific dates and events also does not establish that Buck's version of the events is accurate. Other competent evidence is lacking to support this conclusion. For example, Buck claimed to have kissed Thirjung at one event. Witnesses claimed they never even spoke. He claimed that they engaged in a private conversation about traveling to New York together. Witnesses testified that no such conversation occurred. Buck admitted at the Board hearing that Thirjung never indicated she would travel with him to New York. He claimed Thirjung invited him to her department meeting. Yet Thirjung claimed he arrived uninvited, and another teacher, aware of the situation, testified that she escorted Thirjung to her car that evening to discourage Buck from following Thirjung.

The Commission concluded that, since Buck's letters do not indicate that Thirjung rebuffed him, she must have encouraged him. However, despite his claim that Thirjung sent him at least fifteen romantic letters, Buck retained only one. That letter was signed "Love, Les" yet put off a meeting because Thirjung was "too busy." While the complimentary closing fit within Buck's fantasy, the letter's contents did not encourage him. Furthermore, the Commission's conclusion ignores a considerable body of evidence to the contrary. Thirjung indicated to other teachers that Buck was pursuing her and that it upset her. She continuously updated her husband on Buck's overtures. She sought advice from the athletic director on handling the situation because she was concerned about Buck's mental health. She avoided contact

with him by having another teacher walk with her to her car following a meeting.

The Commission's conclusion ignores Buck's admission that he lied to another teacher about Thirjung pursuing him. It ignores Buck's attempt to suborn perjury. It ignores Buck's own admissions regarding his despondency and suicidal gesture. This evidence supports the conclusion that Buck was inclined to distort reality and lie to protect himself. It refutes the conclusion that Buck's letters accurately chronicled the events or reflected Thirjung's responses to him.

Our review of Buck's letters indicates that they reflect only Buck's persistent goal to engage Thirjung in an extramarital affair and no more. Furthermore, their contents were repeatedly contradicted by the testimony of the complainant and other witnesses. As such, they are not competent, material and substantial evidence in support of the Commission's determination that Buck's version of the events was credible.

Furthermore, while it is not our function to explain Thirjung's decision to write letters to Buck, her failure to keep copies does not establish that she encouraged Buck or did not discourage him as the Commission concluded. Buck's claim that her letters were romantic is not supported by competent evidence on the record. The single letter which he retained can be characterized as no more than friendly. Furthermore, given repeated testimony that Buck's mental health was tenuous, Thirjung's decision not to tell school administrators about his conduct promptly was reasonable under the circumstances. Her decision to seek advice from a limited number of confidants in the school who also knew Buck was also reasonable. While someone else might have dealt with this situation more effectively, Thirjung was not re-

quired to have done so in order to establish her credibility. At the hearings, she testified that she rejected Buck's overtures. We find competent, material and substantial evidence on the record to support her claim.

Generally, we defer to the fact-finder's unique opportunity to judge the credibility of the witnesses. However, in this case, there was not competent material and substantial evidence on the whole record to support the Commission's decision that Buck offered a credible version of the events.

We reverse the Tenure Commission's decision to reinstate Buck and reinstate the decision of the Birmingham School Board.